FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC - 1 2021

SEAN F. McAVOY, CLERK
_____DEPUTY
RICHLAND, WASHINGTON

1  Vanessa Waldref
   United States Attorney
2  Eastern District of Washington
3  Stephanie Van Marter
   Assistant United States Attorney
4  Post Office Box 1494
5  Spokane, WA 99210-1494
   Telephone: (509) 353-2767
6

7              UNITED STATES DISTRICT COURT
8          FOR THE EASTERN DISTRICT OF WASHINGTON

9  UNITED STATES OF AMERICA,          4:21-CR-6008-SMJ-3

10                    Plaintiff,       Plea Agreement

11      v.

12 JERROD JUSTIN HALE,

13
                      Defendant.
14

15

16      Plaintiff, United States of America, by and through Vanessa Waldref,

17 United States Attorney for the Eastern District of Washington, and Stephanie Van

18 Marter, Assistant United States Attorney for the Eastern District of Washington,

19 and the Defendant, JERROD JUSTIN HALE, and the Defendant's counsel, Tim

20 Nguyen, agree to the following Plea Agreement:

21      1.    Guilty Pleas and Maximum Statutory Penalties:

22      The Defendant, JERROD JUSTIN HALE agrees to enter pleas of guilty to

23 Counts 1 and 8 of the Superseding Indictment filed on April 14, 2021, charging

24 him with Conspiracy to Distribute 400 grams or more of Fentanyl, in violation of

25 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) and 846 and Felon in Possession of

26 Firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

27

28 Plea Agreement - 1

The Defendant, JERROD JUSTIN HALE, understands that Count 1 is a Class A felony charge and that the maximum statutory penalty is not less than 10 years imprisonment, which is non-suspendable and non-parolable, and a maximum possible penalty of life imprisonment; a fine not to exceed $10,000,000; a term of supervised release of not less than 5 years up to a life term; denial of certain federal benefits; and a $100 special penalty assessment.

The Defendant understands that Count 8 is a Class C felony and that the maximum statutory penalty for this offense is a term of imprisonment not more than 10 years; a fine not to exceed $250,000; a term of supervised release of not more than 3 years; and a $100 special penalty assessment.

The Defendant further understands that a violation of a condition of supervised release carries an additional penalty of re-imprisonment for all or part of the term of supervised release without credit for time previously served on post-release supervision.

2.    Denial of Federal Benefits:

The Defendant understands that by entering this plea of guilty the Defendant is no longer eligible for assistance under any state program funded under part A of title IV of the Social Security Act (concerning Temporary Assistance for Needy Families) or benefits under the food stamp program or any state program carried out under the Food Stamp Act. 21 U.S.C. § 862a. Further, the Court may deny the Defendant's eligibility to any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States. 21 U.S.C. § 862.

3.    The Court is Not a Party to the Agreement:

The Court is not a party to this Plea Agreement and may accept or reject this Plea Agreement. Sentencing is a matter that is solely within the discretion of

Plea Agreement - 2

the Court. The Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by the Defendant; that the Court will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in this Plea Agreement.

The Defendant acknowledges that no promises of any type have been made to the Defendant with respect to the sentence the Court will impose in this matter. The Defendant understands that the Court is required to consider the applicable sentencing guideline range, but may depart upward or downward under the appropriate circumstances.

The Defendant also understands that should the sentencing judge decide not to accept any of the parties' recommendations, that decision is not a basis for withdrawing from this Plea Agreement or a basis for withdrawing his plea of guilty.

4.    <u>Waiver of Constitutional Rights</u>:

The Defendant, JERROD JUSTIN HALE, understands that by entering this plea of guilty the Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

        (a).    The right to a jury trial;

        (b).    The right to see, hear and question the witnesses;

        (c).    The right to remain silent at trial;

        (d).    The right to testify at trial; and

        (e).    The right to compel witnesses to testify.

While the Defendant is waiving certain constitutional rights, the Defendant understands the Defendant retains the right to be assisted through the sentencing

Plea Agreement - 3

and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if the Defendant cannot afford to hire an attorney.  The Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

     5.   <u>Elements of the Offenses:</u>

     The United States and the Defendant agree that in order to convict the Defendant of Count 1, the United States would have to prove beyond a reasonable doubt the following elements:

> *First*, on a date unknown but by on or about December 2020 and continuing until on or about April 13, 2021, in the Eastern District of Washington, the Defendant, JERROD JUSTIN HALE, entered into an agreement with one or more persons to commit the crime of Distribution of Fentanyl, as charged in the Superseding Indictment;
>
> *Second*, the Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and
>
> *Third,* the agreement was to distribute 400 grams or more of Fentanyl, which was reasonably foreseeable to him as a member of the conspiracy.

     The United States and the Defendant agree that in order to convict the Defendant of Count 8, the United States would have to prove beyond a reasonable doubt the following elements:

> *First*, on or about March 3, 2021, in the Eastern District of Washington, the Defendant, JERROD JUSTIN HALE, knowingly possessed a Ruger LCP.380 caliber pistol, bearing serial number 371903965;

Plea Agreement - 4

*Second,* the firearm had at some point in time prior to March 3, 2021, been transported from one state to another and/or between a foreign nation and the United States;

*Third*, at the time the Defendant possessed the firearm he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year; and

*Fourth,* at the time the defendant possessed the firearm, the defendant knew he was a prohibited person.

6.    Factual Basis and Statement of Facts:

The United States and the Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for JERROD JUSTIN HALE's guilty pleas. The parties acknowledge there are global facts pertaining to the overall conspiracy included within this factual statement to which the Defendant does not have personal knowledge.  However, the Defendant agrees and stipulates that the facts as they pertain directly to his involvement, are accurate.  This statement of facts also does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

On December 13, 2020, Co-Defendant, JONATHAN SCOTT ARD (ARD), was arrested by the Richland Police Department following a shooting outside of his home at 300 Armistead Ave, Richland WA. The circumstances of the shooting were that the victim slashed two tires on ARD's vehicle when he was sitting in the vehicle at the time. It does not appear that the victim knew ARD was in the vehicle. ARD exited the vehicle and shot the victim in the knee.

Plea Agreement - 5

1    The initial dispatch to police involved multiple 911 calls reporting the
2  shooting.  When police arrived, they located the victim in the street with a
3  gunshot wound. The victim told police that he did not know the person that shot
4  him. The victim reported that after he was shot, ARD grab a bag from the
5  driver's side of the vehicle and ran into the residence at 300 Armistead Ave. The
6  victim advised shortly after, ARD returned to the vehicle and grabbed a second
7  bag from the passenger's side and went back inside the residence. ARD had not
8  been seen since he went back into the residence.
9    Based upon the nature of the call and the presence of a weapon, Officers
10  set up containment on the residence. It was during this timeframe that ARD
11  called dispatch and advised that he wanted to change his clothes and then he
12  would come outside. ARD exited the residence in possession of one cell phone
13  and was taken into custody. The cellular phone was seized in anticipation of a
14  search warrant.  When ARD exited the residence, he was not in possession of the
15  firearm used in the shooting. Additionally, when law enforcement responded to
16  the scene, they observed in plain view inside the vehicle, a piece of tin foil with a
17  partially burned blue and white pill.  These items are consistent with the ingestion
18  of illicit Fentanyl laced pills. Det. Matt Nelson applied for and was granted a
19  state search warrant for the residence and the vehicle by Benton County Superior
20  Court Judge Jackie Shea-Brown.
21    Upon entry to the residence, officers made contact with ARD's mother.
22  She identified the downstairs basement as being utilized by ARD.  During a
23  search of the basement, officers located a silver case. Inside the case, were four
24  separate plastic baggies that contained blue pills. The pills were consistent in
25  appearance with Fentanyl laced pills and consistent in appearance with the
26  partially burnt blue pill seen inside the vehicle. The total number of pills
27
28  Plea Agreement - 6

1  appeared to be one hundred per baggie. Other items of evidence found inside the

2  case included tinfoil with burnt residue, a digital scale, and a few loose pills

3  consistent in appearance with Fentanyl. Additional pills, in smaller numbers, and

4  drug paraphernalia were also located throughout the basement consistent with

5  those attributed to use rather than the larger baggies attributed to distribution.

6        A search of the vehicle recovered the previously seen partial burnt blue

7  and white pill on foil as well as an additional baggie of blue pills that was

8  consistent in appearance with the others seized.  The baggie was found on the

9  floor of the vehicle.

10        The pills seized were sent to the DEA lab and returned positive for

11  Fentanyl, weighing .11 grams per tablet.  The total amount of pills seized from

12  inside ARD's residence was 486 pills and an additional 37 pills from inside his

13  vehicle.  *See*, FBI Exhibit 1B1, 1B2.  The total weight of Fentanyl was

14  determined to be 57.53 grams.

15        TFO Brazeau has access to the system that records jail phone calls made

16  from inmates inside Benton County Jail. The system automatically advises

17  inmates that all calls are subject to monitoring and recording. TFO Brazeau

18  reviewed phone calls and video visits made by ARD from the point of his arrest

19  until after his federal Indictment. During this period, TFO Brazeau reviewed

20  several hundred phone calls and video visits.  Through these jail calls and video

21  visits, TFO Brazeau was able to identify several individuals who were working

22  with ARD, to include JARROD JUSTIN HALE, the Defendant.  In summary,

23  ARD, the Defendant and others, made numerous statements about their

24  involvement in trafficking-controlled substances to include Fentanyl laced pills.

25  The following is a sample and summary of some of those calls:

26  JAIL CALLS (December 13, 2020- February, 2021):

27

28  Plea Agreement - 7

On December 13th, 2020, (the day of ARD's arrest), ARD called a woman identified as Amanda Leigh JENNINGS (hereinafter referred to as JENNINGS). ARD directed JENNINGS to get in touch with "Jerrod". He further directed JENNINGS to have "Jerrod" (referring to the Defendant) go to 485 Cottonwood Dr. in Richland, WA[1] before 8am in the morning and to stay there. ARD stated that a package will be delivered to that address in his name and not to let the people at the house get that package.

On December 14th, 2020, ARD told his mother to get ahold of "Amanda" and give her the same telephone number identified for JENNINGS. ARD told his mother that two people owe him over $1,000. ARD identified one of these people as the Defendant.

On December 15th, 2020, ARD was told by JENNINGS that the Defendant picked up the package, as he directed but that it contained dietary supplements. ARD stated that is not what they are, that is just what they look like. ARD told her to tell the Defendant, to open them up and he will see.

On December 15th, 2020 ARD's mother other told him that someone was threatening family members for money he owes "the cartel". ARD asked, "Who, Jordin?" and his mother responded, "yes".

On December 19th, 2020, ARD asked his mother if the police took the silver case (mentioned above) from the basement. ARD stated there were over 500 pills in the suitcase and that he had just re-upped with "Jordin" before the shooting. ARD stated he ran the case from the vehicle into the house following the shooting. This was the action described to police by the victim.

On December 23rd, 2020, ARD told the Defendant that he will get him a number from a person named "Ray" in Tijuana. ARD stated that "Ray" will need

---

1 This was later determined not to be a valid address.

Plea Agreement - 8

two addresses from the Defendant, one is a residential address and one is where the Defendant wanted the packages delivered.  ARD then asked the Defendant if he picked up the package from Cottonwood Dr. The Defendant said he did but that he didn't have a good address. The Defendant said he saw FedEx deliver a package to a house and he went up and grabbed it off the porch. The Defendant said the package did not have ARD's name on it and it contained dietary supplements. ARD said he picked up the wrong package and that there was now a "boat" missing.[2] The Defendant said he "hooked up" with "Jordin". ARD told the Defendant to tell "Jordin" that "Ain't nothing gonna change. As soon as I'm out it's on like Kong".

On December 25th, 2020, ARD told his mother that he does not care about the drugs and that it is fast and easy money.

On December 26th, 2020, during a video visit with BOAK, she mentioned getting sick in Moses Lake because she miscalculated the number of pills she would need. BOAK complained about getting ripped off and having unreliable sources. The Defendant told BOAK to write down the number for the Defendant and that he would come to her wherever with whatever she needed. BOAK replied that the Defendant was the person that had been "plugging" [3] her, but he raised his prices. BOAK stated the Defendant was charging her $10 per pill. ARD responded that he was the one "plugging" the Defendant. ARD told BOAK to tell the Defendant that he knows how much he is getting his pills for and that he should not charge her more than $9 a piece (pill).

On December 26th, 2020, ARD told the Defendant that he bought $3,500 worth of pills from "Jordin" right before the shooting.

---

2 A "boat" is a reference to 1,000 fentanyl laced pills.

3 The term "plugging" means being supplied in the context of drugs.

Plea Agreement - 9

1    On December 28th, 2020 during a video visit, ARD told BOAK that "Jordin"
2  charges $5 a piece (pill).

3    On January 1st, 2021, BOAK asked ARD if "Jordin's" last name is
4  "LEMUS". BOAK stated "Jordin" asked her if she knew anyone who does
5  "Blues", a reference to Fentanyl laced pills. ARD confirmed "Jordin's" last name
6  was LEMUS.[4]

7    On January 4th, 2021 during a jail phone call, the Defendant told ARD, "I
8  don't know how you did it for so long."  ARD responded, "I need you out there"
9  and further advised that only people on his team were making money.

10    On January 24th, 2021, ARD had a video visit with Co-Defendant Jasmine
11 Rae LUCAS, a.k.a. Campbell (hereinafter referred to as CAMPBELL) and the
12 Defendant.  The Defendant told ARD that LEMUS was ripped off for "1/2 a
13 boat" with counterfeit money. During the conversation, the Defendant held up
14 two stacks of cash that each appeared to be about 3-4" tall and said, "You may
15 not be saving up, but I am".

16    On February 2nd, 2021, ARD and LEMUS had a video visit. LEMUS advised
17 that he was in Las Vegas, NV at the time. LEMUS stated that he was going to go
18 to California and will probably have to come back again. LEMUS stated that he
19 drove straight through to Las Vegas via Boise, ID.[5]

20

---

21 [4] On January 6, 2021, Co-Defendant Lemus was positively identified after the
22 Defendant's mother filed a threat report against LEMUS.  TFO Brazeau was also
23 able to locate several video visits between the Defendant and LEMUS, further
24 confirming his identity.
25 [5] The United States would present evidence that it is common for narcotics
26 traffickers to drive long distances without stopping, to stay for a short amount of
27 time before returning and will not have a firm itinerary of where they will be

28 Plea Agreement - 10

On February 6th, 2021, during a jail phone call with ARD, LEMUS advised that he was back in Kennewick, WA. Meaning, LEMUS drove to Las Vegas and California for a maximum of five days.

On February 7th, 2021 during a jail phone call, LEMUS stated that he got the Defendant a "boat" from a source out of Yakima, WA. LEMUS stated he sold half of it to another person. Later that same day, the Defendant advised ARD that he gave LEMUS $2,000 "to go get some cheap ass shit down there" (referring to Las Vegas) and he didn't bring anything back. The Defendant stated he gave LEMUS money for a "boat", but he didn't have half of it. ARD told the Defendant if he put up $7,500 for his bail, it will take him two weeks to get every dollar back to the Defendant. ARD stated, "The sooner I get out the sooner we can start making money". The Defendant responded, "I already know".

On February 14th, 2021 during a jail phone call with ARD, the Defendant, while speaking about LEMUS, said that he (LEMUS) doesn't make any money. The only money LEMUS makes is the money the Defendant puts in his pocket.

Arrest of LEMUS

On February 19th, 2021, TFO Brazeau applied for and obtained a GPS tracking warrant for LEMUS' identified cellular phone. (4:21-mj-07041-MKD).

On February 24th, 2021 members of the Law Enforcement Against Drugs (LEAD) task force were contacted by a Confidential Human Source (CHS) who was in contact with LEMUS. CHS was told by LEMUS that he was going to go to Seattle, WA to pick up boats of pills and heroin.

---

sleeping/staying. TFO Brazeau further knows it is common for drug traffickers to make such short trips south and back in order to pick up a supply of narcotics.

Plea Agreement - 11

TFO Brazeau received the first location ping for LEMUS' phone on February 25, 2021 at about 1:26pm. The phone location was pinging around Tacoma, WA where it remained in and around Seattle /Tacoma for the rest of the day.  It appears the phone was turned off for a period and on February 26, 2021, at about 6:12am, the phone was pinging back in Yakima, WA. TFO Brazeau and other members of the FBI SEWSSTF, monitored the phone locations as it continued into Richland, WA.  Based upon the investigation thus far, it was believed that LEMUS made a supply trip to Seattle and may be in possession of drugs.  As a result, officers followed the phone ping locations until it arrived near LEMUS' newly identified residence. TFO Brazeau observed a vehicle pass by LEMUS' residence two times, once driving east and once driving west. The phone was showing in that exact area at the time. The vehicle then pulled in front of LEMUS's residence and patrol officers initiated a traffic stop. The time was about 8:00am.

LEMUS was identified as the passenger in the vehicle. He exited first. TFO Brazeau heard LEMUS make an unsolicited statement to the effect that he knew that we knew there were drugs in the car. LEMUS acted and appeared as though he was under the influence of narcotics. LEMUS later invoked his right to remain silent.

The driver of the vehicle was identified as Angel CORTEZ, hereinafter referred to as CORTEZ. TFO Brazeau read CORTEZ his rights directly off an FBI Advice of Rights form. CORTEZ stated that he understood his rights and was willing to talk. The form was signed, and the interview was recorded. CORTEZ claimed he met LEMUS when the two were in jail together last year. CORTEZ claimed that LEMUS called him about 1 ½ hours prior to the traffic stop. LEMUS was in Yakima, WA at the Holiday Inn on Yakima Ave. LEMUS

Plea Agreement - 12

said that he did not have a ride home and asked CORTEZ for one. CORTEZ stated that he picked up LEMUS at the hotel. LEMUS was in possession of a brown paper bag, like a large grocery sack. LEMUS got into the back seat of the vehicle. CORTEZ stated that LEMUS was acting paranoid and thought he was being followed. LEMUS proceeded to smoke two Fentanyl laced pills while in the backseat. The pills were LEMUS' and had not been provided by CORTEZ.

TFO Barzeau applied for an obtained a federal search warrant for the vehicle and the cell phone in LEMUS' possession. Upon search of the vehicle, nothing of evidentiary valued was located. However, upon a cursory search of the cell phone, there were drug related messages, images etc. It was then learned that LEMUS was driving a BMW while in Tacoma, which was not the vehicle he was stopped in. Based upon the information from the cell phone, it became clear that LEMUS hid his supply of drugs inside the BMW and left the vehicle at a different residence.

On March 2, 2021, the first Indictment was obtained against the Defendant, ARD and LEMUS. At that time, ARD had been released from state custody and the FBI were looking for both he and the Defendant.

TFO Brazeau reviewed additional jail video visits involving CAMPBELL to attempt to locate the Defendant and/or ARD. On February 25, 2021, during a video visit with another subject by the name of Yesenia Sleepingbear Barreda (BARREDA), LUCAS and the Defendant were in a hotel room together. On March 1, 2021, the Defendant was seen on a video in a hotel room displaying and tossing a large handful of cash into the air. The only denominations visible were $100's.

TFO Brazeau applied for and obtained a GPS Ping Order for the Defendant's cellular phone. *See*, 4:21-mj-07042-MKD. On March 3, 2021, the

Plea Agreement - 13

GPS ping data placed the Defendant's telephone around the Best Western Plus Hotel at 1515 George Washington Way in Richland, WA. Richland Police Officer Rod Matheny contacted the Director of Sales for the hotel, Sara Davis, to determine if the Defendant was a registered guest. Prior to identifying the Defendant by name to Ms. Davis, the Defendant walked past Officer Matheny. Officer Matheny knows the Defendant from previous surveillance and jail booking photos. Officer Matheny stated to Ms. Davis, that he (referring to the Defendant was who he was asking about. Ms. Davis confirmed that the male in question (the Defendant) had checked into room #477 at about 12:30pm that same day. He was with a woman who put the room in her name, identified as Chani BRISBY, another male in an all-blue sweat suit (later confirmed to be ARD), and a young child. Ms. Davis stated that almost immediately she noticed short stay and drop off traffic to the room, meaning to her drug related activity. It was enough of a suspicion of drug related behavior that Ms. Davis made a note of the check in time and warned the occupants as to their behavior. Ms. Davis reviewed a video camera placed in the hallway outside of room #477 and observed the Defendant and the male in the all-blue sweat suit enter and exit the room at different times.

TFO Sgt. B.J. Moos later positively identified ARD in the parking lot of the hotel wearing an all-blue sweat suit. ARD was in a 2020 silver Volkswagen Jetta, bearing Washington license BVX7115. The vehicle was confirmed to be an Enterprise Rental car.  The Defendant was seen coming out to the same vehicle and meeting with ARD before returning to the hotel. ARD was then observed loading items from the interior of the vehicle into the trunk. During this time, CAMPBELL was also observed at the hotel meeting with the Defendant and ARD as well as accessing the hotel room.

Plea Agreement - 14

Around 3:50pm, surveillance observed ARD leave the hotel parking lot in the aforementioned vehicle. Richland PD attempted a traffic stop a few blocks away. ARD sped away in the vehicle for a few additional blocks before coming to a stop and being arrested. The vehicle was impounded to Richland PD in anticipation of obtaining a search warrant. Responding officers, while standing outside the vehicle, could see a black handgun protruding from under the front passenger seat.

ARD was interviewed at the Richland Police Station. He was advised of, and waived, his Miranda Rights. The interview was recorded by audio and video. During the interview, ARD admitted that evidence of a crime would be found in the vehicle. He stated the vehicle contained about 400 Fentanyl pills, ½ an ounce of heroin, a meth pipe, and a gun that he claimed belonged the Defendant. ARD further admitted to working with the identified co-defendants to distribute fentanyl laced pills, methamphetamine and heroin.

On that same date (March 3, 2021), members of the SEWSSTF and other law enforcement contacted the Defendant in room #477 and placed him under arrest. The room was secured in anticipation of obtaining a search warrant. BRISBY was contacted and admitted to renting the room in her name but denied any illegal involvement.

On March 3, 2021, a search warrant was obtained for the hotel room from the Honorable U.S. Magistrate Judge M.K. Dimke (4:21-mj-07062-MKD). The search warrant was executed on that date at about 8:40pm. Multiple items of evidence were found in the hotel room. An Eastport bag was located on the floor of the hotel room which contained the following items: Distribution quantities of pills in different colors and shapes believed to contain Fentanyl; distribution quantities of methamphetamine; distribution quantities of heroin; over $8,800 in

Plea Agreement - 15

1  bulk U.S. currency, digital scales, a Rugar LCP .380 caliber pistol, bearing serial
2  number 371903965, a loaded .380 magazine, and .380 ammunition as well as
3  multiple cellular phones. Located throughout the hotel room were user quantities
4  of cocaine as well as inside the Eastport bag.  Officers also located suboxone
5  strips inside the aforementioned Eastport bag with a few located generally in the
6  room. HALE's wallet and identification was inside the room as well as a purse
7  with the identification of Chani BRISBEY.

8         All drugs were sent to the DEA lab for analysis.  Not all testing has been
9  completed at this time.  The following summarizes the completed lab reports
10 from the drug seized inside the hotel room:  FBI Exhibit 1B6- 14.0 grams of pure
11 methamphetamine; 1B22- 20 Oxycodone tablets; 1B23- 89 Morphine tablets;
12 1B25- 78.7 grams of a mixture of pills containing Clonazapam; 1B26- 9
13 Oxycdone/Moprhine tablets; 1B27- 466 Fentanyl laced tablets; 1B28 427
14 Fentanyl laced tablets; 1B29- 99 Fentanyl laced tablets for a total of 992 tablets,
15 each weighing .1grams for a total weight of 99.2 grams of fentanyl.

16        On March 4, 2021 a search warrant for ARD's vehicle was obtained from
17 the Honorable U.S. Magistrate Judge M.K. Dimke (4:21-mj-07063-MKD). The
18 search warrant was executed on March 5, 2021 at about 8:50am. Located in the
19 vehicle were distribution quantities of what are believed to be Fentanyl laced pills
20 as described by ARD and distribution quantity of heroin both located under the
21 driver's seat, a loaded XDM Springfield .40cal handgun located under the front
22 passenger seat, dominion documents for the Defendant, and several cell phones.

23        The following summarizes the completed lab reports from the drug seized
24 inside ARD's car:  FBI Exhibit 1B59- 12.15 grams of heroin; 1B60- 149
25 Fentanyl laced tablets each weighing .1gram for a total weight of 14.9 grams of
26 Fentanyl.

27
28 Plea Agreement - 16

1   After the arrest of the Defendant and ARD, the investigation continued
2   ultimately leading to the arrest of CAMPBELL on April 22, 2021.  There were
3   additional jail calls prior to her arrest detailing CAMBELL's involvement.  On
4   March 5, 2021 at approximately 3:45 PM, ARD placed a telephone call from the
5   Benton County Jail to CAMPBELL. ARD stated, "I need you to stop everything,
6   they are watching everything, I'm serious, stop everything." CAMPBELL
7   acknowledged the instructions. On April 14, 2021, CAMPBELL, ARD, the
8   Defendant and LEMUS, were all indicted for various counts to include for
9   Conspiracy to Distribute 400 grams or more of Fentanyl.

10   On April 22nd, 2021 at about 8:15 am, TFO Abel Suarez located
11   CAMPBELL and her vehicle, a 2012 Toyota Camry bearing Washington license
12   ALR2374, leaving the Super 8 Hotel located at 626 N Columbia Center Blvd. in
13   Kennewick, WA. CAMPBELL was the sole occupant in the vehicle. TFO Suarez
14   followed CAMPBELL in the vehicle until he terminated surveillance as she
15   turned onto Adams St. from George Washington Way in Richland. The vehicle
16   arrived at CAMPBELL's known address, 211 Delafield Ave in Richland, at
17   about 9:02 AM. CAMPBELL was now the passenger in the vehicle. The driver
18   of the vehicle was later identified as David DEHAGUE, hereinafter referred to as
19   DEHAGUE. CAMPBELL was placed under arrest on her Federal warrant.
20   During a search incident to her arrest, CAMPBELL was found to be in
21   possession of a key chain that had a small cylinder attached. Inside of the
22   cylinder were several blue pills (approximately 10) that resembled illicit Fentanyl
23   laced pills. CAMPBELL was also in possession of a cell phone.

24   DEHAGUE was interviewed at the scene by FBI SA Brett Grover and
25   TFO John D'Aquila. DEHAGUE stated that he has been living at CAMPBELL's
26   residence since around December 2020. DEHAGUE has no means of
27
28   Plea Agreement - 17

employment and is a daily user of Fentanyl. DEHAGUE stated that he is sometimes given pills by CAMPBELL for driving her around. DEHAGUE was aware that when he drove CAMPBELL around that she was likely conducting drug deals.

Inside of the vehicle, in plain view on the driver side door, was a large wad of cash. DEHAGUE stated that the money was his and that it was given to him by CAMPBELL. DEHAGUE indicated that inside of the vehicle, to his knowledge, were a few grams of methamphetamine and about 20 Fentanyl pills. DEHAGUE claimed personal ownership of the narcotics. There were additional bag(s) in the vehicle that were not DEHAGUE's.

On April 28th, 2021 TFO Brazeau obtained a search warrant for the vehicle from the Honorable U.S. Magistrate Judge M.K. Dimke (4:21-mj-07090-MKD). The warrant was executed on that date at about 10:30am. Multiple items of evidence were in the vehicle to include glass smoking pipes with white residue, about 100 pills believed to be Fentanyl, and about ¾ ounce of a crystal substance believed to be methamphetamine. Most of the items were found in a black and grey Adidas backpack that was on the front passenger floor. This is the area where CAMPBELL had been sitting when she was arrested. The amount of cash recovered from the vehicle was $1,139.

The following summarizes the completed lab reports from the drug seized inside CAMPBELL's car or on her person:  FBI Exhibit 1B70- 18 Fentanyl laced tablets each weighing .1gram for a total weight of 1.8 grams of fentanyl; 1B73 and 1B77- 2.93 grams of pure methamphetamine; 1B81, 1B82 and 1B86- 92 Fentanyl laced tablets each weighing .1gram for a total weight of 9.2 grams of Fentanyl; 1B84- 9.3 grams of pure methamphetamine and 1B83- 8 tablets of clonazepam.

Plea Agreement - 18

In addition to the jail audio and video calls which detail the Defendant's drug distribution activities, the cell phones seized, to include several associated with the Defendant, have all been analyzed.  There is a voluminous amount of text messages, images, and evidence of the Defendant's involvement in this Conspiracy. Within these images and messages, is further evidence of the overall quantities of fentanyl laced pills being distributed by the Defendant and his co-conspirators.

8.    The United States Agrees:

(a).    Dismissals:

At the time of sentencing, the United States agrees to move to dismiss Count 5, charging the Defendant with Possession with the Intent to Distribute 400 Grams or More of Fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii); and Count 6, charging the Defendant with Possession with the Intent to Distribute 50 grams or more of actual Methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

(b).    Not to File Additional Charges:

The United States agrees not to bring any additional charges against the Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in this Superseding Indictment, unless the Defendant breaches this Plea Agreement.

(c).    Not to File Penalty Enhancement:

The United States further agrees not to file an Information seeking a Penalty Enhancement pursuant to 21 USC § 851 and the First Step Act.

9.    United States Sentencing Guideline Calculations:

Plea Agreement - 19

The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will determine the Defendant's applicable sentencing guideline range at the time of sentencing.

      (a).    Count 1:

      (1).    *Base Offense Level and application of Relevant Conduct:*

The parties agree and stipulate that more than 400 grams but less than 1.2 kilograms of Fentanyl was distributed in furtherance of the criminal activity jointly undertaken by the Defendant and his co-conspirators; this amount was within the scope of the Defendant's agreement; this amount was reasonably foreseeable to this Defendant in connection with the conspiracy; and this Defendant's relevant conduct for sentencing purposes should be calculated based upon this amount, pursuant to USSG §1B1.3.

Thus, the Government and Defendant agree that the base offense level for Count 1, is 30. *See* USSG §2D1.1(c)(1) and Commentary 8(b).[6]

      (2).    *Specific Offense Characteristics:*

The parties further agree and stipulate that the Defendant possessed firearms in connections with this offense, therefore two additional points should be added to his offense level pursuant to USSG §2D1.1(b)(1).

The parties do not agree as to the application of USSG 2D1(b)(13) and will argue its application at the time of sentencing.

---

[6] In converting the various drugs seized that have been tested thus far, the resulting offense level should be a 28. Based upon application of relevant conduct, the parties agree and stipulate the offense level should be increased to a base offense level of 30. However, if additional lab reports are returned that change this analysis, the parties agree the base offense level is open to argument.

Plea Agreement - 20

      (b).   <u>Count 7</u>:

      (1).   *Base Offense Level*:

The parties agree and stipulate that his base offense level is 20 pursuant to USSG §2K2.1(a)(4).

      (2).   *Specific Offense Characteristics- Dangerous Weapon*:

The parties agree and stipulate that during the course of this offense, the Defendant possessed the firearm(s) in connection with another felony offense therefore four additional points are added to his offense level pursuant to USSG §2K2.1(b)(6)(B).

      (c).   <u>Grouping</u>:

Pursuant to USSG §3D1.1, 1.2 and 1.3, the offense with the highest offense level, will be the offense applicable to the group.

      (d).   <u>Acceptance of Responsibility</u>:

If the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; accepts this Plea Agreement; and enters a plea of guilty no later than the next Pre-Trial Conference, the United States will move for a three (3) level downward adjustment in the offense level for the Defendant's timely acceptance of responsibility, pursuant to USSG §3E1.1(a) and (b).

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, not recommend a three (3) level downward reduction for acceptance of responsibility if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

Plea Agreement - 21

Furthermore, the Defendant agrees to pay the $100 mandatory special penalty assessment for each count of conviction to the Clerk of Court for the Eastern District of Washington, at or before sentencing, and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment, as a condition to this recommendation by the United States.

        (e).   Criminal History:

The United States and the Defendant understand that the Defendant's criminal history computation is tentative and that ultimately the Defendant's criminal history category will be determined by the Court after review of the Presentence Investigation Report. The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined after the Presentence Investigation Report is completed.

10.   Departures:

The Defendant intends to request downward departures and variances from the sentencing guidelines. The United States reserves its right to oppose any such motion.

11.   Safety Valve:

The parties agree the Defendant is not eligible for the application of the safety valve provisions of 18 U.S.C. § 3553(f) and USSG §5C1.2 or the First Step Act.

12.   Length of Incarceration:

The United States agrees to recommend no more than 188 months incarceration. The Defendant is free to argue any legal sentence.

Plea Agreement - 22

13.    <u>Criminal Fine:</u>

The United States and the Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

14.    <u>Judicial Forfeiture:</u>

The Defendant, JERROD JUSTIN HALE, agrees to voluntarily forfeit and relinquish all right, title and interest he has in the following assets to the United States:

- $8,942.00 U.S. currency; and,

- a Ruger LCP .380 caliber pistol, bearing serial number 371903965.

- Any and all seized ammunition and accessories, including:

    Forty-nine (49) .380 rounds with a stamp of *I*;
    Forty (40) .380 rounds with a stamp of "Federal Auto";
    Thirty-five (35) .380 rounds with a stamp of "Win Auto"; and,
    Twenty-six (26) .380 rounds with a stamp of "ACP Tulammo.
    all contained in a black case; and,

    Fifteen (15) loose rounds of .380 ammo stamped "Win Auto"; and,
    a loaded magazine.

The Defendant acknowledges that the assets are subject to forfeiture to the United States pursuant to 21 U.S.C. § 853 as facilitating property and/or as property constituting proceeds obtained directly or indirectly from the offense, Conspiracy to Distribute 400 grams or more of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) and 846, charged in Count 1 of the Superseding Indictment and/or pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), as property involved or used in the commission of the offense Felon in

Possession of Firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), as charged in Count 8 of the Superseding Indictment.

The Defendant agrees to take all steps as requested by the United States to pass clear title to the assets to the United States and to testify truthfully in any forfeiture proceeding. Defendant agrees to hold all law enforcement agents and the United States, its agents, and its employees harmless from any claims whatsoever arising in connection with the seizure, abandonment, or forfeiture of any asset covered by this agreement.

The Defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. Defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of the asset(s). Defendant waives oral pronouncement of forfeiture at the time of sentencing, and any defects that may pertain to the forfeiture.

The Defendant waives further notice of any federal, state or local proceedings involving the forfeiture of the seized assets the Defendant is agreeing to forfeit in this Plea Agreement.

15.    Supervised Release:

The parties agree to recommend that the Court impose a 5-year term of supervised release, to include the following special conditions, in addition to the standard conditions of supervised release:

(1)    that the Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Office; and

Plea Agreement - 24

(2)     that the Defendant have no contact with any witnesses or Co-defendants in this cause number.

16.     <u>Mandatory Special Penalty Assessment</u>:

The Defendant agrees to pay the $100 mandatory special penalty assessment for each count of conviction to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

17.     <u>Payments While Incarcerated</u>:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, the Defendant agrees to earn the money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

18.     <u>Additional Violations of Law Can Void Plea Agreement</u>:

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

19.     <u>Appeal Rights</u>:

In return for the concessions that the United States has made in this Plea Agreement, the Defendant agrees to waive his right to appeal the conviction and sentence if the Court imposes a prison term no higher than 188 months and no more than 5 years supervised release.  If the Court imposes a sentence in excess of 188 months incarceration and/or greater than 5 years of supervised release, the Defendant may appeal only the substantive reasonableness of his sentence.

Plea Agreement - 25

Defendant further expressly waives his right to file any post-conviction motion attacking his conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence. Should the Defendant successfully move to withdraw from this Plea Agreement or should the Defendant's convictions on Counts 5 and 6 of the Indictment be dismissed, set aside, vacated, or reversed, the Plea Agreement shall become null and void; the United States may move to reinstate all counts of the Superseding Indictment No. 4:21-CR-16-6009-SMJ-2; and the United States may prosecute the Defendant on all available charges involving or arising out of the Superseding Indictment No. 4:21-CR-16-6009-SMJ-2. Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack of the conviction or sentence, including, but not limited to, proceedings pursuant to 28 U.S.C. § 2255 (writ of habeas corpus).

      20.  <u>Integration Clause</u>:

      The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case. This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities. The United States and the Defendant agree that this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

Plea Agreement - 26

Approvals and Signature

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.


Vanessa Waldref
United States Attorney


_____                    12/01/2021
Stephanie Van Marter                          Date
Assistant U.S. Attorney


I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney.  I understand and voluntarily enter into this Plea Agreement.  Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case.  No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in any way to enter into this Plea Agreement.  I am agreeing to plead guilty because I am guilty.


_____                    11-27-21
JERROD JUSTIN HALE                            Date
Defendant


I have read the Plea Agreement and have discussed the contents of the agreement with my client.  The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties.  I concur in my client's


Plea Agreement - 27

1  decision to plead guilty as set forth in the Plea Agreement.  There is no legal

2  reason why the Court should not accept the Defendant's plea of guilty.

3

4  _____          11/29/2021

5  Tim Nguyen                                 Date

6  Attorney for the Defendant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  Plea Agreement - 28